# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,    )<br>                        )<br>           Plaintiff,     )<br>vs.                       )<br>                        )<br>MATTRESS FIRM, INC.,    )<br>                        )<br>          Defendant.    )<br>                        ) | Case No.: 2:13-cv-01745-GMN-VCF<br><br>**ORDER** |

Pending before the Court is the Motion for Partial Summary Judgment, (ECF No. 81), filed by Plaintiff United States Equal Employment Opportunity Commission ("EEOC"). Defendant Mattress Firm, Inc. ("Mattress Firm") filed a Response, (ECF No. 87), and the EEOC filed a Reply, (ECF No. 93).[1]

Also pending before the Court is Mattress Firm's Motion for Summary Judgment. (ECF No. 82).  The EEOC filed a Response,[2] (ECF No. 86), and Mattress Firm filed a Reply, (ECF

---

[1] Also pending before the Court is the Stipulation of Dismissal, (ECF No. 85), of several of Mattress Firm's affirmative defenses.  For good causing appearing, the Court GRANTS this Motion.

In addition, pending before the Court is the EEOC's Motion to Reconsider, (ECF No. 119), Magistrate Judge Cam Ferenbach's Order, (ECF No. 118), granting Mattress Firm's Motion to Strike Untimely Designated Witnesses, (ECF No. 115).  Because the Motion does not implicate the instant motions for summary judgment and the Court grants summary judgment in favor of Mattress Firm, the Court DENIES the EEOC's Motion to Reconsider as moot.

[2] In an earlier Order, the Court granted permission for the EEOC to file a response exceeding the page limits permitted by the Local Rules. (Order, ECF No. 77).  However, the Response filed by the EEOC improperly circumvents even this increased page limit by relying on a separate, thirty-page Statement of Material Facts, (ECF No. 86-1).  Although the Court in this instance has attempted to trace the EEOC's factual allegations from its Response to its Statement of Material Facts and finally to the corresponding exhibit, future filings by the EEOC must comply with the District of Nevada's Local Rules. *See* L.R. 7-3.

No. 97).  For the reasons discussed below, the Court GRANTS Mattress Firm's Motion for Summary Judgment and DENIES as moot the EEOC's Motion for Partial Summary Judgment.

## I.     BACKGROUND

The EEOC brought this lawsuit against Mattress Firm for alleged violations of the Age Discrimination in Employment Act ("ADEA") on behalf of John Gillespie ("Gillespie"), Hooshang Seisan ("Seisan"), Jackie Donahue ("Donahue"), Kathy Thanos ("Thanos"), Stuart Katz ("Katz"), Faron Hansen ("Hansen"), William James ("James"), Frank MacLean ("MacLean"), and Robert Schnair ("Schnair") (collectively "Represented Parties"). (Compl. ¶¶ 8, 12, ECF No. 1).  In particular, the EEOC asserts that, as a result of age discrimination, Gillespie, Seisan, Donahue, Thanos, Katz, Hansen, James, and MacLean (collectively "Resigning Employees") were constructively discharged and Schnair was terminated. (*Id.* ¶¶ 27, 29).

The Represented Parties are former employees of Bedtime Mattress Company ("Bedtime"), a Las Vegas area retail store. (Def.'s MSJ 13:18–24, ECF No. 82); (Pl.'s Resp. 10:10–11, ECF No. 86).  Most of Bedtime's sales force were over age forty. (Pl.'s Resp. 12:2–3).  In March of 2007, Mattress Firm acquired Bedtime and its sales employees. (*Id.* 10:10–11); (Def.'s MSJ 11:21–12:4).  When Mattress Firm President and CEO Gary Fazio ("Fazoio") announced the buyout to the Bedtime employees, he stated that "nothing would change" after the acquisition. (Pl.'s Resp. 12:21–22).  Despite this assurance, Mattress Firm required the former Bedtime employees to perform new tasks in professional business attire including unloading and moving mattresses, hanging banners, and cleaning the store. (*Id.* 14:19–21); (Def.'s MSJ 11:2–19).

Following acquisition of Bedtime, Mattress Firm staffed former Bedtime stores with former Bedtime employees as well as generally younger Mattress Firm Ambassadors ("Ambassadors"). (Pl.'s Resp. 15:22–25); (Def.'s MSJ 12:2–4, 12:24–13:3).  Ambassadors are

Mattress Firm sales associates from stores across the country who apply to Mattress Firm's Ambassador Program and, if accepted, are temporarily assigned to work as sales associates at new Mattress Firm stores. (*Id.* 13:4–7). Mattress Firm compensates Ambassadors with a guaranteed salary during their assignment at an acquired store. (*Id.* 13:8–10).

On September 23, 2013, the EEOC filed its Complaint alleging that Mattress Firm disparately treated the Represented Parties as compared to the Ambassadors due to age-related discrimination resulting in their constructive discharge or termination. (*See generally* Compl.). Mattress Firm's instant Motion seeks summary judgment on the EEOC's claims with respect to all of the Represented Parties. (*See* Def.'s MSJ). Because the factual background is lengthy, the Court will discuss the facts as they pertain to each particular Represented Party in the discussion section, *infra*.

## II.   <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." C.*A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.   <u>DISCUSSION</u>

The EEOC claims that Defendants violated the ADEA by engaging in age discrimination under a theory that specific individuals were subjected to disparate treatment based upon their age.  Under the ADEA, employers may not "fail or refuse to hire or . . . discharge any individual [who is at least forty years old] or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  In order to establish a disparate treatment claim, the plaintiff must produce evidence that gives rise to an inference of unlawful discrimination, either through direct evidence of discriminatory intent or through the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003); *Diaz*, 521 F.3d at 1207.

Direct evidence is "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).  In the context of an ADEA claim, direct evidence "is defined as evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Enlow v. Salem–Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004).  When a plaintiff opposing summary judgment presents direct evidence of a discriminatory motive, analysis of the direct evidence under the *McDonnell Douglas* burden-shifting framework is

inappropriate. *France v. Johnson*, 795 F.3d 1170, 1173 (9th Cir. 2015), *as amended on reh'g* (Oct. 14, 2015).

Where no direct evidence exists, courts must proceed under the *McDonnell Douglas* framework. "Under the *McDonnell Douglas* framework, a plaintiff must carry the initial burden to establish a prima facie case that creates an inference of discrimination." *Id.* "The burden of establishing a prima facie case of disparate treatment is not onerous." *See Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002). On summary judgment, the degree of proof necessary to establish a prima facie case "is minimal and does not even rise to the level of a preponderance of the evidence." *See Schechner v. KPIX–TV*, 686 F.3d 1018, 1025 (9th Cir. 2012). If the employee establishes a prima facie case, an inference of discrimination arises and the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its employment action. *France*, 795 F.3d at 1173. If the employer does so, the burden shifts back to the employee to prove that the employer's explanation is a pretext for discrimination. *Id.*

The EEOC argues that direct evidence of Mattress Firm's discriminatory intent exists. (Pl.'s Resp. 34:17–19, ECF No. 86). As direct evidence, the EEOC points to statements in a declaration given by a former Mattress Firm district manager, Chris Brown, recounting statements allegedly made by Mattress Firm executives. (*Id.*). Specifically, Brown alleges that Mattress Firm's Director of Training and Recruitment and Regional Manager for the Las Vegas area suggested that because the Represented Parties were "older," "[t]hey're not motivated" or "hungry." (Brown Decl. 14:16–22, Ex. 17 to Akhavan Decl., ECF No. 88-18). As a result, Mattress Firm "focused on college-age recruiting." (*Id.* 9:23–24). However, Brown also asserts that "[i]t was never [that the Ambassadors] are coming in [to the Las Vegas area stores] because we want to replace [the Represented Parties]." (*Id.* 15:16–17). These statements are similar to the employer's statement in *France* expressing a preference for "young, dynamic agents." *France*, 795 F.3d at 1172. The Ninth Circuit panel found that statement "probably

goes beyond a stray remark . . . although standing alone this evidence would be thin support to create a genuine dispute of material fact." *Id.* at 1173.  Likewise, the Court finds the statements by Mattress Firm executives probably more than stray remarks, but insufficient to create a genuine dispute of material fact by themselves.  Accordingly, the Court proceeds under the *McDonnell Douglas* framework.

To establish a prima facie case of disparate treatment under the first step of the *McDonnell Douglas* test, the EEOC must show that: (1) the Represented Parties belong to a protected class; (2) they were qualified for his position; (3) they were subject to an adverse employment action; and (4) similarly situated individuals outside their protected class were treated more favorably. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).  The Court considers these requirements in turn, first with respect to the Resigning Employees, and next with respect to the single terminated employee, Schnair.

### A.   Resigning Employees

With regard to the Resigning Employees, only the third prong of the *McDonnell Douglas* test is in dispute. (*See* Def.'s MSJ 29:10–12, ECF No. 82).  The EEOC argues that the Resigning Employees "suffered adverse employment actions when they were constructively discharged." (Pl.'s Resp. 35:3–5).  Constructive discharge occurs when "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004).  The working conditions must "deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood[.]" *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000).  A hostile-environment constructive discharge requires the plaintiff to show "something more" than what is required under an ordinary claim of hostile work environment. *Suders*, 542 U.S. at 147.  The Ninth Circuit has explained that:

> We set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable.

*Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007).  Indeed, an employee who quits his employment without giving his employer a reasonable chance to resolve a problem "'has not been constructively discharged.'" *Id.* (quoting *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996)).  The Court will discuss the EEOC's claim of constructive discharge as it pertains to each Resigning Employee.[3]

### i.   *John Gillespie*

Mattress Firm hired Gillespie when he was fifty-eight years old. (Gillespie Dep. 9:19–21, Ex. 21 to Akhavan Decl., ECF No. 88-22).  As a Bedtime employee, Gillespie worked as a sales manager.  Following the conversion of Bedtime Mattress stores to Mattress Firm Stores on May 2, 2007, Gillespie's position changed to "sales associate." (*Id.* 11:6–12:20).  Gillespie found this adjustment to be a demotion that was insulting to his experience. (*Id.*).  Gillespie also testified that even though he believed only one sales associate was sufficient to staff stores, he was scheduled to work with a second sales associate on the weekends. (*Id.* 33:20–24).  As a result, his commissions were reduced.  (*Id.*).  However, Gillespie stated that he "never had issues with money with Mattress Firm." (*Id.* 17:16–17).  According to Gillespie, Mattress Firm "treated [him] fairly and paid [him] correctly." (*Id.*).

With regard to his working conditions, Gillespie testified that Mattress Firm employees acted in an arrogant and hostile manner towards him. (*Id.* 29:22–25).  Further, Gillespie states

---

[3] The Resigning Employees present overlapping theories of constructive discharge.  To the extent the Court addresses a complaint raised by one Resigning Employee, it will not again address the same complaint raised by the remaining Resigning Employees.

that his supervisors would not answer his calls. (*Id.* 30:7–10). Gillespie also complains that he could not check stock in stores outside the Las Vegas area. (Gillespie Dep. at 12, Ex. E to Def.'s MSJ, ECF No. 82-5). Nevertheless, Gillespie "[did]n't think it was an issue" as "[his] sales were never substandard." (*Id.* at 12–13).

In addition, Gillespie took issue with Mattress Firm's requirement that all sales associates move and unload store merchandise, hang banners, and clean stores. (*Id.* at 13–14). Gillespie "believe[s] that in [his] situation [he] was forced to do this physical labor with the intent to get rid of [him]." (*Id.* at 13). After he was asked to move "40 pieces of bedding," Gillespie resigned on May 22, 2007. (*Id.* at 14, 17). During the one month Gillespie worked for Mattress Firm, he never complained to anyone at Mattress Firm about his belief that he was being discriminated against on the basis of his age. (*Id.* at 14).

The EEOC's evidence regarding Gillespie's working conditions merely shows his dissatisfaction with the change in his position, an unproductive relationship with his supervisors, and generally unpleasant working conditions. First, to the extent Gillespie's change in position and related alleged pay decrease constitutes a change in "working conditions," "a demotion, even when accompanied by a reduction in pay, does not by itself trigger a constructive discharge." *King v. AC & R Advert.*, 65 F.3d 764, 767–68 (9th Cir. 1995) (applying California constructive discharge law that mirrors federal law requiring plaintiff show work conditions were objectively extraordinary and egregious). The EEOC's evidence of Gillespie's change in position and his supervisors' behaviors would not lead a reasonable jury to find his working conditions were "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood." *Brooks*, 229 F.3d at 930.

Second, the EEOC does not dispute that moving store merchandise, hanging banners, and cleaning the store were job duties that applied to all Mattress Firm sales associates. The

record is devoid of any evidence demonstrating that Mattress Firm required the Represented Parties to perform tasks not expected of younger sales associates. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000) (requiring the non-movant on summary judgment to show that a factual dispute truly exists once the movant demonstrates an absence of evidence supportive of a claim).

Finally, the EEOC offers no evidence that Gillespie provided Mattress Firm with a reasonable opportunity to remedy the alleged age-related harassment. *Poland*, 494 F.3d at 1184 (noting that an employee who quits his employment without giving his employer a reasonable chance to resolve a problem "has not been constructively discharged"). It is undisputed that Gillespie did not report his supervisor's "arrogant" behavior or his co-workers' joking. When Gillespie approached his supervisors regarding his frustrations, Gillespie did not indicate that he believed his perceived mistreatment was age based. Based on these facts, a reasonable juror could not find that Mattress Firm was given a real opportunity to address the alleged discrimination.

For these reasons, summary judgment with respect to Gillespie's claim is GRANTED.

### ii. *Hooshang Seisan*

A majority of the other Represented Parties' complaints do not apply to Seisan. Indeed, Seisan "did not have any issue or complaint with the expectation that [he was] to clean the restrooms, vacuum, clean the windows, and maintain the store in a professional manner." (Seisan Dep. at 9, Ex. C to Def.'s MSJ, ECF No. 82-3). Further, Seisan does not regard Mattress Firm's requirement that sales associates move store merchandise and hang banners as part of his complaint. (*Id.* at 7). In fact, Seisan testified that "no one at Mattress Firm ever

1   made any type of reference . . . to [his] age."[4] (*Id.* at 16).  Instead, Seisan's dissatisfaction with

2   Mattress Firm appears to stem from a series of conflicts with his supervisor, Brown.

3        On August 22, 2007, Seisan complained to Fazio that Brown inflated sales associates'

4   sales goals. (*Id.* at 9).  Following an investigation, Leslie Shaunty, Mattress Firm's Vice

5   President of Human Resources, informed Seisan that Brown had inflated the sales goals of

6   every store under his supervision and had been reprimanded for his misconduct. (*Id.* at 11).

7   Seisan nevertheless continued to feel that Brown inflated sales goals because of Brown's

8   "attitude toward [Seisan]." (*Id.* at 12).  Following this incident, "Brown's attitude with [Seisan]

9   became less abrasive." (*Id.*).  However, Seisan "voluntarily left the position" of store manager

10  to have "less contact with the abusive language of [Brown]." (*Id.* at 4).  As a result, a younger

11  assistant manager was moved into Seisan's former store manager position. (*Id.*).

12       Seisan cites other instances of conflict with Brown.  For example, shortly before Seisan

13  left, Brown called him "stupid." (*Id.* at 8).  Further, Brown threatened Seisan with a write-up

14  regarding a mistake in inventory, but Seisan admits the inventory was inaccurate. (*Id.* at 8).

15  Seisan ultimately resigned on October 16, 2007. (Putnam Decl. ¶ 7, Ex. B to Def.'s MSJ, ECF

16  No. 82-2).  During his employment with Mattress Firm, Seisan never complained that his

17  working conditions were a result of age-related discrimination. (Seisan Dep. at 15).

18       The record shows that a reasonable person in Seisan's position would not have felt

19  compelled to resign because of age-based discrimination.  In *Montero v. AGCO Corp.*, 192

20  F.3d 856, 861 (9th Cir. 1999), the Ninth Circuit held that an employee is not constructively

21  discharged when the harassing behavior has not occurred for a significant period of time and

22  the employee is aware that the employer has taken significant steps to prevent further

---

24  [4] While Seisan states that Brown once used the term "old-timers" in a meeting, he believes "old-timers" referred

25  not to the Represented Parties' age but rather distinguished between the former Bedtime employees and the new
    Mattress Firm employees. (Seisan Dep. at 16).

harassment. *Montero*, 192 F.3d at 861.  The facts of Seisan's claim fit squarely within that mold.  First, Seisan's resignation came less than two months after the harassing behavior stopped.  Second, even though Seisan was not told the particulars of the disciplinary action taken, he was made aware that Brown had been disciplined and that Brown had inflated the sales goals for every store he supervised.  Finally, as with the other Resigning Employees, Seisan's failure to raise concerns regarding age-based discrimination during his employment with Mattress Firm foreclose his constructive discharge claim. *See U.S. E.E.O.C. v. Wedco, Inc.*, 65 F. Supp. 3d 993, 1007 (D. Nev. 2014) (finding no constructive discharge where employee did not give "a real opportunity to attack the discrimination" by reporting discriminatory behavior including use of the word "nigger," racial jokes, and a comment that noose was intended for him).

For these reasons, summary judgment with respect to Seisan's claim is GRANTED.

### iii. *Jackie Donahue*

Donahue worked for Mattress Firm for thirteen days, resigning on May 11, 2007. (Putnam Decl. ¶ 7).  Donahue's complaints regarding Mattress Firm center on the physical requirements of her position. (*See* Donahue Dep., Ex. P to Def.'s MSJ, ECF No. 82-16). Donahue testified that regardless of age, Mattress Firm's expectation that sales associates move mattresses is "an inappropriate expectation . . . because their job is to sell[, not] to be . . . a warehouse person." (*Id.* at 7).  Donahue complains that she was expected to "unload the delivery trucks unassisted." (*Id.* at 4).  However, "[she] was never told that [she] would have to move mattresses by [herself] unassisted." (*Id.* at 5).  Moreover, Donahue refused to unload trucks and was never disciplined for her refusal. (*Id.* at 6).  Donahue was also "asked to hang banners, and it seemed to [her] that the banners were strategically placed to make it amazingly difficult for [her] to do it." (*Id.*).

Regarding her interactions with co-workers, Donahue claims that when she "would walk into a room the laughing, giggling, talking [between her supervisors and the younger sales associates] stopped immediately." (*Id.* at 10).  Donahue also states that sales associates would joke that "[y]ou're too old to understand computers." (*Id.* at 13).  Further, Donahue stated that her supervisors would not answer the phone when she called. (*Id.*).

Although Donahue initiated a complaint with human resources, her complaint related to her belief that she should have access to her personnel file. (Donahue Dep. 6:16–19, Ex. 22 to Pl.'s Resp., ECF No. 88-23).  Donahue "had a feeling that there was some things being put in [her personnel file] that maybe weren't accurate," although the EEOC has presented no evidence substantiating Donahue's suspicions. (*Id.* 7:6–8).

At most, Donahue has presented evidence of generally unpleasant working conditions and a feeling of being unfairly criticized by her supervisors.  As a matter of law, these events do not rise to the level of "intolerable" discriminatory acts which would compel any reasonable person to quit. *See Poland*, 494 F.3d at 1184 (finding no constructive discharge where employee is reassigned to another state, resulting in separation from family, and demoted to a non-supervisory position); *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1184 (9th Cir. 2005) (finding no constructive discharge where employee was sexually harassed, received adverse performance memoranda, was subject to snide remarks, and warned that his performance would be reevaluated after a thirty-day period); *Brooks*, 229 F.3d at 922 (declining to find constructive discharge where male employees ostracized plaintiff, her supervisors mistreated her, and she had trouble getting her desired work shift and preferred vacation dates while other employees with less seniority got their preferences); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465–66 (9th Cir. 1994) (holding constructive discharge does not occur when an employee resigns following sexual harassment by a supervisor coupled with low performance marks). For these reasons, summary judgment with respect to Donahue's claim is GRANTED.

iv.   *Kathy Thanos*

Mattress Firm hired Thanos when she was fifty-seven years old. (Thanos Dep. 9:4–5, Ex. 30 to Pl.'s MSJ, ECF No. 88-31).  In her first two months of employment, Thanos expressed interest in the area manager position to her supervisor but failed to ask what she needed to do to apply. (*Id.* 47:19–49:18).  Thanos did not discuss the subject again or actually apply for the position. (*Id.* 49:3–5).  A couple of weeks after the original discussion, Thanos testified that Mattress Firm filled the position with a younger sales associate. (*Id.* 49:15–18). During this same time, Thanos "was so afraid [she] was going to get fired" that she resigned her store manager position. (*Id.* 57:16–24).  She was later transferred to what she regarded as "a lower performing store, thereby further reducing [her] monthly income." (*Id.* 46:14–19).

Thanos's time with Mattress Firm was marred by other issues as well.  Thanos complains that she was assigned to work with another sales associate, resulting in less commissions. (*Id.* at 43:8–18).  In addition, Thanos was written up shortly after Mattress Firm acquired Bedtime for a "dress code issue." (*Id.* 56:20–25).  Further, Thanos testified that younger employees "would make fun of [her] to her face," and her supervisor did not prevent this behavior.  (*Id.* at 45:6–13).  In one instance, Thanos states that a supervisor laughed at her when she was unable to move a mattress due to an ankle injury. (*Id.* at 53:14–17).

Despite these issues, Thanos continued to work for Mattress Firm for almost two years. (Putnam Decl. ¶ 7).  Ultimately, however, Thanos resigned because she felt her supervisor placed more pressure on her than other sales associates. (Thanos Dep. at 63:3–6).  Before resigning, Thanos never complained about her working conditions to anyone at Mattress Firm. (*Id.* at 53:18–20, 63:3–6).

The evidence offered by the EEOC regarding Thanos cannot overcome the high bar to show constructive discharge.  Putting aside Thanos's failure to actually apply for the area manager position, Mattress Firm's failure to offer her an interview for this position is too

remote an event to support a claim of constructive discharge. *See, e.g.*, *In Suk Kim v. Vilsack*, No. C 10-2101 CW, 2012 WL 368477, at *16 (N.D. Cal. Feb. 3, 2012) (noting that the length of time between protected activity and resignation is a factor in determining whether a reasonable person would have found the working conditions to be intolerable).  Moreover, Thanos's subjective fear of future discipline does not support a finding of constructive discharge. *See Huskey v. City of San Jose*, 204 F.3d 893, 902 (9th Cir. 2000).

Further, the EEOC's evidence regarding co-workers' age-related joking is insufficient to create a genuine issue of fact as to whether Thanos's employment was so discriminatory that a reasonable person would have quit.  There is no showing of a continuous pattern of discriminatory treatment.  Indeed, courts have found that work environments that were filled with many more instances of discriminatory and more severe conduct were not sufficient to create a hostile work environment that would cause a reasonable person to quit. *See, e.g.*, *Morgan v. City and County of San Francisco,* No. C–96–3573–VRW, 1998 WL 30013, at *8 (N.D. Cal. Jan. 13, 1998) (finding insensitive coworker remarks such as "[y]ou don't fit in," poor performance evaluations, inaccurate reporting of sick leave, and having to tell receptionist before leaving work station did not rise to the level of a hostile work environment).

Finally, as with the other Represented Parties, the fact that Thanos was a member of the protected class when hired by Mattress Firm counsels against an inference of age discrimination. *See Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1096 (9th Cir. 2005) ("[A]n employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs."); *Diaz*, 521 F.3d at 1209 ("If [defendant-employer] was biased against older workers, it presumably would not have hired Plaintiffs in the first place.").  For these reasons, summary judgment with respect to Donahue's claim is GRANTED.

### v.   *Stuart Katz*

Katz worked as a store manager for Mattress Firm for four years until resigning on November 29, 2011. (Katz Dep. at 3, 5, Ex. H to Def.'s MSJ, ECF No. 82-8).  In Katz's resignation e-mail to his supervisor, Katz explained that he was resigning because of "an opportunity to make a higher income elsewhere." (*Id.* at 5).  Katz also testified that he stayed with Mattress Firm "until [he] saw that [he] wasn't going to go anywhere else with them . . . and found a company that the pay structure was a little bit better." (*Id.* at 8).

As with the other Represented Parties, Katz never complained to Mattress Firm that he believed he was being discriminated against. (*Id.* at 4, 6–7).  Indeed, Katz's complaints appear to center around unfair store assignments and assigned sales goals. (*Id.* 5).  On this point, Katz testified that when "a good store opened up, somebody of a younger age was put in there." (*Id.* at 8).  Katz also stated that he "never heard any supervisor or manager make any age-based comments." (*Id.* at 9).

The EEOC's evidence of Katz's working conditions do not meet the high standard for a constructive discharge claim.  Further, Katz never testified that he felt compelled or forced to resign, only that Mattress Firm "didn't make it easy for [him] to stay there." (*Id.* at 5).  Instead, Katz testified that he resigned to find a better employment opportunity. *See Poland*, 494 F.3d at 1185 (considering employee's proffered reasons for resigning in evaluating constructive discharge claim).  Such testimony belies a claim that working conditions at Mattress Firm were so "extraordinary and egregious" that Katz was constructively discharged. *See Brooks*, 229 F.3d at 930.  Accordingly, the Court GRANTS summary judgment with respect to Katz's claim.

### vi.   *Faron Hansen*

Hansen was hired at age fifty as an assistant manager and later promoted to a store manager of Mattress Firm's Silverado location, "a higher volume store." (Hansen Dep. at 3–4,

Ex. G to Def.'s MSJ, ECF No. 82-7).  During his employment with Mattress Firm, Hansen applied for an area manager position twice, once near the end of 2007 and a second time in 2009 or 2010. (*Id.* at 10).  Hansen did not receive the position in either instance. (*Id.*).  In this regard, Hansen believes that younger employees were treated better because they were "partying" and "hanging around" with supervisors and received promotions in 2007. (Hansen Dep. 47:14–48:12, Ex. 8 to Akhavan Decl., ECF No. 88-9).

Similar to the other Represented Parties, Hansen complains about Mattress Firm's practice of assigning two sales associates to work together, or "doubling up." (Hansen Dep. at 5, Ex. G to Def.'s MSJ)  Hansen testified that during the first three months following the acquisition, Mattress Firm would assign two-to-three sales associates in one store during the week and on weekends. (*Id.* at 12)  After this original surge, however, Mattress Firm reduced staffing to one sales associate during the week and two on weekends. (*Id.*).  Mattress Firm's practice of doubling up resulted in lower commissions for Hansen. (*Id.*).  Hansen also complains that in 2010, a supervisor told him he "was making bonus money too often" and the supervisor and "his boss had came [sic] to some kind of agreement that they were going to do everything they could do to help make it so that [he] couldn't make bonus money." (*Id.* at 13).

Hansen states that he complained to his direct supervisors that he "felt like [he] was discriminated against for all kinds of incidences that happened, that they were treating [him] unfairly, [and] talk[ing] down to [him]." (*Id.* at 11).  However, Hansen did not complain of discrimination during his initial interviews with the EEOC or his conversations with Mattress Firm's human resources representatives. (*Id.*).  In fact, Hansen contacted the EEOC in 2008 regarding an unrelated issue, but did not raise concerns regarding discrimination. (*Id.* at 12).

In March of 2011, Hansen was demoted to the manager on duty.[5] (*Id.* at 6).  Hansen attributes his demotion to an inventory discrepancy. (*Id.*).  Specifically, on March 2, 2011, Hansen was disciplined for failing to properly represent inventory count. (*Id.*).  While Hansen does not disagree with this disciplinary action, Hansen complains that he "consistently told the managers that the inventory count was off month after month, and they didn't do anything to exasperate [sic] it." (*Id.* at 6, 8).  Further, Hansen believes another employee who also had inventory problems was not written up. (*Id.* at 9).  Hansen ultimately resigned on July 7, 2011, because he felt "trapped" at Mattress Firm. (*Id.* at 9).  Hansen felt that "regardless of [his] performance, regardless of [his] sales, regardless of [his] experience . . . it wouldn't make any difference." (*Id.* at 9).  Even before these events, however, Hansen was contemplating leaving to "take maybe a year off and enjoy [himself] and just look into some other opportunities." (*Id.* at 7).

The EEOC's evidence does not demonstrate that Hansen's working conditions had deteriorated beyond what a "reasonable person could tolerate." *Poland*, 494 F.3d at 1185.  Most of the behavior Hansen cites as discriminatory occurred between 2007 and 2010, well before Hansen's resignation.  Moreover, the fact that Hansen remained in his job another four years following the initiation of the allegedly intolerable conditions belies his claim of constructive discharge. *Id.* (rejecting constructive discharge claim where employee worked under allegedly "intolerable" conditions "for five months before deciding to retire").  Regarding the events in 2011, as discussed with respect to Gillespie, *supra*, "a demotion, even when accompanied by a reduction in pay, does not by itself trigger a constructive discharge." *King*, 65 F.3d at 767–68.

---

[5] Hansen also believes he was demoted on an earlier occasion in 2007. (Hansen Dep. 36:21–37:10, Ex. 8 to Akhavan Decl.).  As a Bedtime employee, Hansen worked as a district manager. (*Id.*).  However, he was hired by Mattress Firm as a store manager. (*Id.*).

This evidence does not support a finding that Hansen's working conditions were "extraordinary and egregious," and the Court GRANTS summary judgment with respect to Hansen's claim.

### vii. *William James*

James was fifty-seven or fifty-eight when he was hired by Mattress Firm as a manager on duty. (James Dep. 10:9–11, Ex. 12 to Akhavan Decl., ECF No. 88-13).  Although Mattress Firm later offered James the opportunity to become a store manager, James declined. (James Dep. at 6, Ex. Q to Def.'s MSJ, ECF No. 82-17).  In his testimony, James claims that Mattress Firm discriminated against him in several ways.  First, James disputed Mattress Firm's vacation policy. (*Id.* at 7).  James complained to Fazio, his district manager, Mattress Firm's Human Resources Department, and the EEOC that he had not received proper vacation pay, but never complained that he felt he was being discriminated against based on age. (*Id.* at 7).

Second, James points to a "miscommunication" incident that occurred shortly after the transition in April of 2007 as evidence of Mattress Firm's discrimination. (James Dep. 20:11–23:16, Ex. 12 to Akhavan Decl.) ("Q: So you believe that this miscommunication that occurred in April of 2007 played a role in why you felt Mattress Firm forced you to resign in 2009? A: I don't feel it; I know it.").  Third, James felt that younger sales associates received better opportunities than the former Bedtime employees. (*Id.* 29:19–30:21).  Finally, James testified that his former district manager, Brown, told him that "he [Brown] was directed to get rid of all the Bedtime Mattress employees." (James Dep. at 3, Ex. Q to Def.'s MSJ).

This evidence fails to establish a triable dispute of fact that the working conditions experienced by James were so intolerable that a reasonable person would have felt compelled to leave.  James testified that no one at Mattress Firm made any disparaging remarks regarding age. (James Dep. 33:24–34:6, Ex. 12 to Akhavan Decl.).  Further, the evidence demonstrates that Mattress Firm offered James a store manager position, which James claims was only available to younger associates. (James Dep. at 6, Ex. Q to Def.'s MSJ).  Finally, Brown left

seven months after Mattress Firm acquired Bedtime. (*See* Brown Decl. 36:5–8).  As a result, Brown's statements cannot form the basis for James's resignation nearly two years later. *See Steiner*, 25 F.3d 1465 (consdering harasser's termination in evaluating whether working conditions were intolerable at the time of resignation).  For these reasons, the Court GRANTS summary judgment with respect to James's claim.

### viii.    *Frank MacLean*

Mattress Firm hired MacLean, born in 1937, as a manager on duty.[6] (Ex. 36 to Akhavan Decl., ECF No. 88-37).  MacLean ultimately resigned on July 30, 2007.  As evidence supporting MacLean's claim of constructive discharge, the EEOC relies almost exclusively on MacLean's EEOC charge. (*See* Pl.'s Statement of Material Facts ¶¶ 272–280).  After considering the statements in MacLean's EEOC charge, the Court declines to admit them as inadmissible hearsay. *See Rossi v. Trans World Airlines, Inc.*, 507 F.2d 404, 406 (9th Cir. 1974) (affirming the district court's decision to disregard an affidavit containing inadmissible hearsay).  Although the statements were given under a penalty of perjury, MacLean was never subject to cross-examination by anyone concerning the statements and there is nothing inherently trustworthy about the statements. *See, e.g.*, *Stolarczyk ex rel. Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F. Supp. 2d 834, 841 (N.D. Ill. 2005).  Because no other evidence supports the EEOC's assertion that MacLean was constructively discharged, the Court GRANTS summary judgment on his claim.

---

[6] Although MacLean passed away in December of 2012 before this lawsuit was instigated, the EEOC may continue to represent MacLean. *See E.E.O.C. v. Timeless Investments, Inc.*, 734 F. Supp. 2d 1035, 1056 (E.D. Cal. 2010) ("Because the ADEA is remedial in nature, an ADEA claim survives a claimant's death . . . . However, claims for ADEA 'liquidated damages' are considered 'penal' or 'punitive' in nature and thus, do not survive the claimant's death.").

### B.     Terminated Employee – Robert Schnair

Schnair was sixty-five when he was hired by Mattress Firm as store manager. (Schnair Dep. at 4, Ex. F to Def.'s MSJ, ECF No. 82-6).  Unlike the other Represented Parties, Schnair was terminated by Mattress Firm following a confrontation at Mattress Firm's Tropicana store. (*Id.* at 6).  On Friday, June 29, 2007, Schnair locked and left the store to get lunch as he had during his three years with Bedtime. (*Id.* at 7–8).  Schnair states that he is diabetic and required food to address his condition, but acknowledges that he never informed anyone at Mattress Firm about his condition. (*Id.* at 8).  At that time, Schnair was unaware of Mattress Firm's policy that did not allow the store to be locked or left unattended during business hours. (*Id.*). When Schnair returned to the store, his supervisor, Zach Busby ("Busby"), and Mattress Firm Vice President Dave Brummett ("Brummett") were in the store. (*Id.*).  They approached Schnair while he was eating his lunch and informed him of Mattress Firm's policy. (*Id.*). Schnair demanded to see the written policy, but Brummett was unable to locate it. (*Id.*).

Brummett then asked Schnair to leave the store, leave his store keys, and return on Monday. (*Id.*).  When Schnair asked if he was terminated, Burnett replied, "We'll know on Monday [after consulting with human resources]." (*Id.*).  Schnair refused to leave his keys unless he was terminated. (*Id.*).  Burnett clarified that Schnair was suspended until Monday so that human resources could determine the appropriate disciplinary action. (*Id.*).  Schnair "felt . . . a little bit like a little kid being told to go to time out." (*Id.* at 9).  Schnair ultimately left the store with his keys and was terminated the next day. (*Id.* at 6).

Aside from this incident, Schnair testified that although he never complained to Mattress Firm, he felt discriminated against because of Mattress Firm's physical requirements and staffing practices. (*Id.* at 10, 12).  Schnair further testified that when he was unable to move mattresses by himself, he received assistance from someone else. (*Id.* at 5).  Schnair was never

reprimanded for refusing to move stock he could not move himself or refusing to hang banners. (*Id.* at 6).

As noted above, under the *McDonnell Douglas* framework, the burden of production first falls on the EEOC to make out a prima facie case of discrimination. *Davis*, 520 F.3d at 1089.  If the EEOC does so, the burden of production shifts to Mattress Firm to present evidence sufficient to permit the factfinder to conclude that it had a legitimate, nondiscriminatory reason for the adverse employment action. *Id.*  Finally, if Mattress Firm satisfies this burden, the EEOC must then demonstrate that Mattress Firm's articulated reason is a pretext for unlawful discrimination. *Id.*

### i.    *Prima Facie Case*

The EEOC has failed to establish a prima facie case of racial discrimination. Specifically, the EEOC has not demonstrated the fourth element—"similarly situated individuals outside [his] protected class were treated more favorably." *Id.*  To show that the employees allegedly receiving more favorable treatment are similarly situated, the EEOC "must demonstrate, at least, that [Schnair is] similarly situated to those employees in all material respects." *Moran*, 447 F.3d at 755.  Individuals are similarly situated when "they have similar jobs and display similar conduct." *Vasquez*, 349 F.3d at 641.

Schnair admits that he argued with and used profanity towards Busby and Brummett when the two confronted him about leaving his store unattended. (Schnair Dep. at 8).  The EEOC has provided no evidence that another employees engaged in conduct similar to Schnair and received less severe discipline.  Indeed, Schnair testified that he is unaware of another employee who displayed similar behavior and remained at Mattress Firm. (*Id.* at 12). Accordingly, the EEOC's prima facie showing of age discrimination against Schnair fails for lack of showing that similarly situated employees not in his protected class received more favorable treatment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### ii.    *Nondiscriminatory Reason*

Even if the EEOC had satisfied its burden of establishing a prima facie case, Mattress Firm has offered a legitimate nondiscriminatory reason for its actions: Schnair's inappropriate and insubordinate conduct. (Def.'s MSJ 42:9–12).  Mattress Firm's proffered reason is supported by evidence, including Schnair's own testimony. (*See id.*).  Schnair's misconduct qualifies as a legitimate and non-discriminatory reason for his termination.  Accordingly, Mattress Firm has satisfied its burden of articulating a legitimate, non-discriminatory reason for the challenged action. *See McDonnell Douglas*, 411 U.S. at 802.

### iii.    *Pretext*

Finally, the burden shifts to the EEOC to raise a genuine factual question as to whether Mattress Firm's proffered reason is a mere pretext for discriminatory animus.  A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence. *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000).  Where a plaintiff presents direct evidence that the proffered explanation is a pretext for discrimination, "very little evidence" is required to avoid summary judgment. *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009).

As discussed above, the EEOC's direct evidence, standing alone, is insufficient to defeat summary judgment.  When a plaintiff has some direct evidence but also must rely on circumstantial evidence to show pretext, courts treat direct and circumstantial evidence alike and consider both types of evidence cumulatively. *France*, 795 F.3d at 1175.  "[C]ircumstantial evidence that tends to show that the employer's proffered motives were not the actual motives 'must be "specific" and "substantial" in order to create a triable issue with respect to whether

the employer intended to discriminate[.]'"[7] *Blue v. Widnall*, 162 F.3d 541, 546 (9th Cir. 1998) (quoting *Godwin*, 150 F.3d at 1222).

The EEOC fails to meet its burden of offering "specific" and "substantial" evidence that insubordination and use of profanity with supervisors was pretext for an age-motivated termination. *See Blue*, 162 F.3d at 546. Schnair testified that Mattress Firm's expectations that sales associates move mattresses, hang banners, and clean the store were put in place in an effort to get the former Bedtime employees to quit. (*Id.* at 10). Further, Schnair felt that Mattress Firm discriminated against him by "doubling up" staffing and reducing his commissions. (*Id.* at 12). This testimony is insufficient to create a genuine issue of fact that Schnair's termination was pretextual. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (finding no genuine issue where only evidence presented is "uncorroborated and self-serving" testimony).

The EEOC also points to statistical evidence that "[d]espite the 43% availability of workers age 40 or over for sales positions in the Las Vegas area from 2007 through 2011, the district managers hired younger workers at a statistically higher rate than their availability for such jobs during the 2007-2011 time period." (Pl.'s Resp. 52:1–4). Further, the EEOC points out that "[o]f the twenty-five (25) sales associates who were promoted during 207 [sic] through 2011, only two (2) were over the age of 40 when they were promoted, the rest were under age 40." (*Id.* 52:26–53:1). This evidence fails to create a genuine issue of fact. Statistics "must show a stark pattern of discrimination unexplainable on grounds other than [age]." *Aragon v.*

---

[7] The Ninth Circuit has questioned whether a "specific and substantial" showing is proper for circumstantial evidence, especially where it has noted that this standard "is tempered by our observation that a plaintiff's burden to raise a triable issue of pretext is hardly an onerous one." *See France*, 795 F.3d at 1175. The Ninth Circuit has not, however, overruled this standard and has in fact suggested in other cases that "specific and substantial" evidence may be necessary for direct, as well as circumstantial, evidence. *See Coghlan*, 413 F.3d at 1095. The Court therefore applies the "specific and substantial" standard to the present matter.

*Republic Silver State Disposal Inc.*, 292 F.3d 654, 663 (9th Cir. 2002), *as amended* (July 18, 2002).  The EEOC's statistical evidence presents no stark pattern, nor does it account for possible nondiscriminatory variables, such as job performance or the number of promotable employees within the protected class who were not offered a promotion. *See id.*; (James Dep. at 6, Ex. Q to Def.'s MSJ) (discussing promotion offered by Mattress Firm that James declined).

Further, as discussed above, the EEOC has failed to submit any evidence demonstrating that other employees argued with and used profanity towards a supervisor without being subject to discipline. *Snead v. Met. Prop & Cas. Ins. Co.*, 237 F.3d 1080, 1094 (9th Cir. 2001) (holding that lack of evidence that similarly situated employees were treated differently weighs against a finding of pretext).  Moreover, Mattress Firm's decision to hire Schnair at age sixty-five counsels against a finding of pretext. *See Coghlan*, 413 F.3d at 1096 ("[A]n employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs.").

The EEOC has not provided any evidence from which it could create a genuine issue of material fact that Mattress Firm's legitimate reason for terminating Schnair was pretext for age discrimination, particularly given that Schnair does not dispute the material facts surrounding his termination.  Accordingly, summary judgment is GRANTED with respect to Schnair.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

IV.     **CONCLUSION**

**IT IS HEREBY ORDERED** that Mattress Firm's Motion for Summary Judgment, (ECF No. 82), is **GRANTED**.

**IT IS FURTHER ORDERED** that the EEOC's Motion for Partial Summary Judgment, (ECF No. 81), is **DENIED as moot**.

**IT IS FURTHER ORDERED** that the Stipulation of Dismissal, (ECF No. 85), is **GRANTED**.

**IT IS FURTHER ORDERED** that the EEOC's Objection, (ECF No. 119), is **DENIED as moot**.

The Clerk of the Court shall enter judgment accordingly.

**DATED** this __27__ day of September, 2016.


_____
Gloria M. Navarro, Chief Judge
United States District Judge